We will hear argument first this morning in case 19-465, Chiafalo v. Washington. Mr. Lessig. Mr. Chief Justice, may it please this Court, the question in these cases is straightforward. Do the states have the power to control, through law, how an elector may vote? They do not. The ordinary expected meaning of the words of the Constitution against the background of the framers' deliberation make it clear that the states have no such power. But what is also clear is that Washington does not like the Constitution's design. It asks this Court to read the word elector as agent, or maybe better, minion, and it declares that the votes electors cast are not, as the Constitution expressly describes them, their votes, meaning the electors' votes, but instead are the votes of the state. Article II in Washington's hands effectively gives the states the power to cast votes for president in such manner as the legislature thereof may direct. But the actual Article II does not give the states the power to cast votes. It gives the states the that the Constitution creates have a legal discretion, as every elector does. Not an unfettered discretion, as Washington puts it. To the contrary, a completely fettered discretion, just fettered by moral and political obligations, not by legal constraint. Washington's alternative to, quote, vest discretion in citizens rather than electors may be a better plan, at least if part of change, but the question for this Court is not which plan would be better. The question is, which plan is the Constitution now? And the answer to that question is clear in the Constitution's text. The states get to appoint, no doubt, but they appoint electors who are then privileged to cast their votes without regulation by the state. Mr. Lessig, do you object to the pledge itself? Assume there's no fine or any other sanction. Is simply requiring a prospective elector to take a pledge okay, in your view? Absolutely, Your Honor. A pledge understood the way Wray understood a pledge, having no legal obligation but a moral obligation, is perfectly fine as part of the appointment power of the state. Well then, so the addition of a sanction makes no difference? No, the sanction makes all the difference. So long as there is not a legal sanction, then a pledge is appropriate. So same in the context, Your Honor, of the speech and debate clause. Of course, you can't punish somebody for a vote in Congress, but there's nothing inconsistent with a speech and debate clause in asking a member to make a pledge. Indeed, states right now ask members to make a pledge as a condition of being a party member. So if there were a fine of one dollar, you would say that violates the Constitution, but if it's simply a pledge, no violation at all? That's right, because a fine is a legal obligation. It crosses the line because the state has no such power to impose such an obligation. Your argument is not that the sanction must have coercive effect. It's simply a, if it's only a symbolic requirement, it still violates the law? No, Your Honor, it's symbolic requirement. It's, of course, an important moral requirement. It's a moral obligation when you take a pledge, but it can't cross the line and become a legally coercive obligation consistent with the freedom that the Constitution grants electors to vote by ballot. So by legally coercive, you mean something different than simply coercive? In other words, if you add one dollar, that becomes legally coercive? That's right, just as with the speech and debate clause. If you fine a congressperson one dollar for his speech or his vote on the floor of the house, that's fine, but there's no problem with saying to that congressperson, to be a member of the Republican Party, you must pledge to support the platform of the Republican Party. Under your view, there would be no way to enforce the popular vote referendum? The National Popular Vote Compact? Is that what you mean, Your Honor? Right, I mean, assuming that gathers enough support and becomes law, there'd be no way to enforce it? Well, Your Honor, that obligation requires the states to pick a select slate of electors that sits with the winner of the National Popular Vote, and that slate of electors then would have the same discretion, legal discretion, that we believe any elector has. But of course, if there's a National Popular Vote Compact, the number of electors for the winner would be so significant, it would be very hard to imagine any discretion affecting the ultimate result. Thank you, counsel. Justice Thomas? Thank you, Chief Justice. Mr. Lessig, just a preliminary question. Should we ask ourselves whether or not the state is granted the authority to regulate the vote of the elector, or should we ask ourselves whether the Constitution prohibits the state? Your Honor, I think you should ask the question both ways, and it's the same answer, the both ways. The only argument the state has made in Washington, in the Washington case, is an argument grounded in the Appointment Clause. They don't invoke the Tenth Amendment. So the question is whether the Appointment Clause gives them power to control, and we believe they do not. But then you can look at it from the other side and ask, as an elector who is given an obligation to vote by ballot, does that obligation entail a protection from legal regulation? And we believe just as the Speech and Debate Clause does, it creates an immunity from being punished for how one votes. When you make your, I'm curious, when you make your federal function argument, does that dependent part on your view that the elector has discretion? The federal function establishes the discretion, Your Honor. It's exactly the same as in the cases of Hawk and Lesser, where the question was a state legislator's discretion to vote on an Article V amendment. And of course, the state legislator works for the state. It works for the people of the state. It works subject to the Constitution of the state. But what Hawk and Lesser establish is that that state legislator is free of the impositions of the state, either through referendum or a constitutional, on the Constitution itself, when that legislator votes on an Article V amendment. And that's the same immunity that we think a presidential elector has. How do we determine what the contours of this federal function, of the federal function? I would look just to the text. The federal function in balloting, as Ray described it, is a function in casting a ballot, as the 12th Amendment describes, and then the additional steps that help 12th Amendment requires, which is to name the president and vice president, make lists and so forth, sign and certify and send it forward. That's the function which the Constitution gives to electors, distinct from the power to appoint, which Ray also describes. But does the 12th Amendment mention discretion? No. The 12th Amendment mentions the vote. And of course, by requiring that someone make a list of the people that was voted for, it implies that there's more than one person that could be voted for. But of course, the 12th Amendment also doesn't mention the state at all. Yet the way the state conceives of it, the state is a proctor that stands in the room as the electors cast their votes, looking over their shoulder. But that's nowhere in the 12th Amendment, Your Honor. The state doesn't appear in the 12th Amendment except to name where the electors will meet. You know, can the state remove someone, for example? I just wonder what limits, what authority the state actually has here. Can the state remove someone who openly solicits payments for his or her vote? You can certainly, of course, this Court has said in Burroughs and in Fitzgerald v. Green, the state can certainly regulate corruption and bribery would be corruption. And we believe that it's absolutely clear that the state has that, the government has that power right now. But where's the authority? Where does that come from? Well, it's interesting, Burroughs itself, Burroughs versus the United States, of course, found it inherent in the federal power to be able to protect federal elections from corruption. In Fitzgerald v. Green, they saw it as incidental to the power to appoint electors to be able to assure that the election, in that case, the vote by the people was consistent with law. Either of those could create the authority to avoid corruption. But of course, corruption, like bribery, is independent of the vote. You don't need to police the vote to be able to police corruption, just as with the speech and debate clause, you can convict a congressperson of bribery, even though the bribery includes the vote that might have occurred. Justice Ginsburg? Mr. Lessing, I was surprised at the answer you gave to the Chief about Wray. I would have thought that under your absolute elected discretion view, Wray should have come out differently under your theory. No, Your Honor. We think Justice Jackson in Wray was completely right about the original understanding. And we think Justice Jackson was completely wrong about what followed from that judgment. That's absolutely clear. But they did not inscribe that belief into the text of the Constitution. They could have. Maryland's Electoral College had that text in the Constitution to constrain the discretion in a particular way. But our Constitution didn't, which means that the question in Wray was whether the state had the power to discriminate on the basis of political affiliation and loyalty when picking electors. And after the 12th Amendment, we believe that's that's the function that the Electoral College has come to occupy. It's somewhat hard to understand the concept of something I am pledged bound to do. I have made a promise to do something, but that promise is unenforceable. I understand, Your Honor. And it is difficult until we recognize how familiar it is. Every single political pledge is of this character. We couldn't find a single case in the history of political pledges where a pledge has been considered as anything beyond a moral obligation. We cited the Kucinich versus Texas Democratic Party case where Texas requires candidates to pledge to support the candidate in the Democratic Party. And that was upheld explicitly on the ground that that was simply a moral obligation. And we can see that in the context of Congress again. Again, there's no problem with requiring a member of the Republican Party to pledge to support the Republican Party as a condition of being a candidate for Congress. But we understand the speech and debate clause to say you can't punish them for their vote. And the pledge is not inconsistent with the speech and debate clause. It's perfectly consistent because a pledge is always and only a moral obligation. Thank you. Justice Breyer. Thank you. Good morning. Counsel, a state can appoint people requirement that they be permanent residents of the state. That's all right, isn't it? Of course. Of course. And then could they say, and you must be a permanent resident at the time that you cast your vote? Yes. Yes. And then what happens if, in fact, Mr. Smith, who is a permanent resident when elected, changes his residency and goes to a different state before the vote is cast? Now, he is not a permanent resident. He hasn't met the state's requirement. And so could the state also say, in case that happens, we have an alternate who will cast the vote? Yes, we believe they can, because the requirement. Difference between that and this situation, where they say you must promise to vote for the person who wins the most votes. And then he gets to the room and in that room, he doesn't live up to that requirement, just as he didn't live up to the requirement that he be a resident of the state. Your Honor, the difference is the line between the appointment and the voting. The Constitution draws that line. It says that Congress can set the time of the appointment and they can set the day on which the vote is cast. And we believe incidental to the appointment power is the power of the state to assure that there is an elector there who will perform the function, the federal function of balloting. But once the voting starts, the state disappears. The state does not appear at all except to name the location of the vote in the 12th Amendment. It certainly doesn't stand there to observe whether someone's voted properly. If, in fact, he changes his residence 10 minutes before he casts his vote, then you could remove him. But you say he can't. They can't state when, in fact, he actually casts the vote. But surely a person who casts the vote for Jones instead of Black has, in fact, changed his mind 10 minutes before. And so can you not, in fact, remove him because of that preceding change of mind 10 minutes before? No, because the pledge is a pledge made prior to the appointment. It's not a pledge in my hypothetical. It is a requirement that he, in fact, cast his not cast his vote, but that he, in fact, be a person willing to cast his vote for Mr. Jones, the majority winner, at least 10 minutes before. I'm just trying to make it as close as possible to the person who changes his residence 10 minutes before. But again, Your Honor, the Constitution gives the states no power to regulate the vote. They have the power to appoint. And incident to that power to appoint, Ray said they can say you must make a pledge to support the party nominee. And at the time my clients made their pledge, they absolutely intended to vote for the party nominee. So the regulation that's authorized by Ray has nothing to do with what you've described, which is the regulation of the vote. Justice Alito? Justice Alito? Yes, Mr. Lessig, my question is similar to Justice Breyer's, or at least it follows along the same line. Suppose an elector is bribed between the time of popular vote and the time when the electors vote. Can the state remove that elector? Your Honor, we believe that prior to the vote, the state's power is, the incidental power exists to assure that the person who shows up has not engaged in the criminal, is not engaged in the criminal activity. It's difficult to imagine how that plays out, though, because of course the claim someone has been bribed is a charge. It needs to be proven. And so we believe there's going to be a difficulty there with the bribery. But let's remember that the framers expressly considered this problem. George Mason expressly said the reason not to have electors is that they could be bribed. But what the framers saw is that there were two risks. There was the risks of elector bribery, but there was also the risk of cabal corruption, as Madison put it. Your argument must be either that the electors cannot be removed by the state. The state says that at least some removal power goes along with the appointment power. So I think your argument has to be they can't be removed or there are at least some circumstances in which they can be removed. And if there are some circumstances in which they can be removed, such as when the elector has been bribed, why would the violation of a pledge not be one of those circumstances? Your Honor, we have said that the bribe is different from a pledge because of course the bribe is proven differently from, separately from how one votes. So we recognize that there's capacity to regulate bribery. But your question is perfectly framed because I do want to assert that there's no power to remove prior to the vote. The power that comes from, for example, 3 U.S.C. 4, which Congress gives the states the power to fill vacancies, is the power to fill a vacancy once the vacancy occurs. It's not the power to create a vacancy. And that's the structure that the Constitution establishes as well. So the state cannot create a vacancy by removing an elector who has been bribed? Yes, unless the bribery statute makes as a penalty a removal from office and there's a conviction prior to the actual time at which the vote has been taken. One other question if I can. Those who disagree with your argument say that it would lead to that in where the election, where the popular vote is close and changing just a few votes would alter the outcome or throw it into the House of Representatives. There would be, if the rational response of the losing political party or elements within the losing political party would be to launch a massive campaign to try to influence electors. And there would be a long period of a good possibility if your argument prevails? We deny it's a good possibility. We don't deny it's a possibility. We believe there are risks on either side, which is a good reason to avoid the risk adjusted constitutional interpretation. We agree that, of course, the possibility exists that you could flip electors. But look historically at the number of times that could have mattered. In fact, in the history of electors, there has been one elector out of the 23,507 votes cast who has switched parties against the majority party in a way that it could have mattered. That was the very first time this happened, Samuel Miles in 1796. In the ordinary close election. Justice Sotomayor. Counsel, you compare in your brief the electoral college to a jury arguing that they are structurally similar under the Constitution. You can't remove a juror because of his or her vote. But if that's true, I don't see how that could be true. The jurors are supposed to be impartial, not to discuss the case with anyone during the trial, not to research the case with the parties, to tell the truth during broad deer. Yet if a juror is selected and violates one of those pledges, say the juror talks about the case with the other jury members, the judge is empowered with others than the jury members. The judge is empowered to remove that juror. So why isn't a presidential elector subject to being removed in the same way? He has made a particular pledge, different than remaining impartial, but he has told the people who have appointed him, I will vote in this particular way. You call it morally, commit myself. So why isn't that any different than a juror who says I'm not going to vote this, and then does it, and a judge can remove it? Well, Your Honor, you've identified the core immunity that a juror has, and that is the immunity in the vote to convict or not. And we agree that is an immunity that cannot be regulated, can't be punished, it can't be fined for a vote improper, according to the court or the state. Though there are other obligations, you're right, that you can be held to account for. We think that's perfectly parallel with the presidential elector. The presidential elector has an immunity in his or her vote. But of course, sitting in the elector room, he can't cause a disturbance, he can't threaten somebody with a weapon, he can't engage in any number of criminal activities that might, of course, interfere with the opportunity to perform the duty. There's no general immunity. There's a particular immunity, because the immunity to vote is an immunity from penalty for vote, just as the Speech and Debate Clause cases have made clear. Now, you rely a lot on history in your argument. But doesn't McPherson undermine your position very directly, just like Gray does in some extent? In those cases, the court made clear that whatever the framers expected, and here you make a good argument that some of the framers originally expected electors to have discretion, that historical practice since the founding offered a practical interpretation of the Constitution. That's what Gray said. And McPherson said, experience soon demonstrated that the electors were chosen simply to register the will of the appointing state. Don't that same principle undermine whatever you think some of the framers expected. That historical practice, at least since the 12th Amendment, has shown that states have imposed not just pledges, but have imposed fines and some are faithless. Your Honor, first, no state has ever, prior to 2016, imposed a fine to remove the elector. But number two, our argument has nothing to do with expectations. It is the state's argument that hangs on expectations. What we say is that the Constitution, as McPherson says, should be read not according to modern-day expectations, but according to the words, the ordinary expected meaning of the words the framers used in the Constitution. So in McPherson, questions? Mr. Lessin, so let me ask you about those words. As I understand it, most of your argument depends on a particular reading of the terms vote and ballot and elector. And of course, you know, usually we think of those terms as involving some choice, but not necessarily. People are electors, at least formally. People vote, at least formally. People cast ballots, at least formally, at times when there is no choice. Think of a Soviet-style system, or, you know, think of somebody who has pledged himself to vote because another person is voting another way. So why do these terms necessarily involve choice in the way you suggest? Well, Your Honor, we believe, as Chief Justice Roberts has described, that the best way to understand these words, the best dictionary, is the Constitution itself. The Constitution speaks of elector in two contexts. Article I speaks of what Justice Thomas has referred to as congressional electors, namely voters. And we believe the freedom of congressional electors is exactly the freedom of presidential electors. And we understand the authority of this Court to establish that the office, as Justice Kennedy put it in his opinion in Thornton, the office of the elector, the elector there meaning the congressional elector, is created by the Constitution, and it's free of constraints, either private constraints or state constraints. So it's the same sense of elector that the Constitution is. Now, of course, they could have said, we mean by elector in Article I, someone who has freedom and discretion, but by Article II, we mean what will become the Soviet Union conception of elector. That would have been possible. We're not saying it's impossible to imagine this. We're saying the ordinary expected meaning of these words would have supported the discretion that absolutely the framers expected electors would have. And if that's right, Mr. Lessig, if your reading is very deeply contextual, then shouldn't we look to what happened in the first elections under the Constitution, where immediately, right away, electors associated themselves with political parties, pledged their votes ahead of time, and it's that practice that has continued for over 200 years? So if your reading isn't demanded by dictionaries, but is instead demanded by context and history, doesn't the context and history suggest the opposite? Your Honor, we believe the context and history supports the idea absolutely that electors were to pledge themselves. We're not saying that the Constitution required them to be Hamilton's philosophers. That's not our claim. Our claim is that the discretion that they created in the office of elector survives. So yes, look at 1796, where the first so-called faithless elector, Sam Miles, switches sides. This, of course, is noticed and objected to. And indeed in 1800, that election also was complicated by the failure of electors to do what they were expected to do. Gallatin noted that to Jefferson and said to Jefferson, we should eliminate electors. And Jefferson said, yes, let's have a amendment. Justice Gorsuch? Counsel, could a state, for example, ask an elector to make a sworn statement as to his present intention to vote for a particular candidate, make the pledge an oath? Yes. And could a state later prosecute that elector for perjury if that statement under oath, if there's evidence that that was a false statement? In principle, absolutely, Your Honor. We think in practice that would be just like with a judge making a promise to a Senate committee prior to a confirmation. That would be incredibly difficult to imagine enforcing in a way that wouldn't be just retaliatory against a particular elector. And could a state say that we'll pay your expenses and give you a per diem for your service, but only if you carry out your promise to vote in a particular way that you pledged initially? No, that's what Washington's new law, in fact, does. That is, in effect, a penalty as well. Why couldn't it do that if it could do the other things? Well, again, Your Honor, the difference is between a legal consequence or a legal penalty based on your judgment, your vote, a federal function of balloting, which is free of state control, and the other incidental powers relative to appointment. And so in appointment, I want to make sure you're an honest person. I'm sorry for interrupting, but I'm not sure I understand where you're going, so I just want to cut to it if we can. So a state, in my last hypothetical, is just simply saying, we'll pay your lunch, your travel, and your per diem if you conform to your pledge under oath. And that's not permissible, but it is permissible to convict an elector for perjury. I'm just, I'm sorry about that. Well, that's right, Your Honor, because perjury involves a false statement at the time the pledge is made. In our case, our electors absolutely intended to vote for Hillary Clinton. If Hillary Clinton won the election- I'm not asking about your client. Just stick to the hypothetical, counsel, please. Okay, but the hypothetical imagines that someone has committed a criminal act. Okay, on the basis of the criminal act, in theory, they could be punished. That's right. But the difference between an elector who gets compensated based on their vote or not based on their vote is a difference driven by the substance of the constitutional discretion that electors are given, the federal function in balloting, the right to vote. And with respect to the perjury example, could the state remove that individual and not count his vote? Your Honor, the perjury example does not allow them to remove the individual, no. And what we know in the context of other areas where votes have been tainted, for example, a bribery conviction, which involved a vote in Congress, is the vote is not not counted. It's just a consequence of the separation between the prosecution- Well, I'm sorry. I thought you indicated to earlier questions that you thought it was fine for a bribed elector to be removed from office prior to voting. Yeah, I said that if you convict and convict the person prior to the actual voting, then you could remove them if it was- Okay, the same would be true with perjury, I suppose, then, too? No? If you could structure the statute and succeed in the conviction. But of course, the perjury requires at the time a false statement. Thank you, counsel. Justice Kavanaugh? Thank you, Mr. Chief Justice. Good morning, Mr. Lessig. I want to follow up on Justice Alito's line of questioning and what I might call the avoid chaos principle of judging, which suggests that if it's a close call or tiebreaker, that we shouldn't facilitate or create chaos. And you, I think, answered and said it hasn't happened, but we have to look forward and just being realistic, judges are going to worry about chaos. So what do you want to say about that? It's a good thing to consider, Your Honor. And what we've said is, yes, on the one side, you might worry that there's increased risk of, quote, chaos if electors have the discretion we believe they've always had. We suggested the likelihood that is tiny, given it requires electors who are the loyal of the loyal to band together in dozens or three dozen in the last election and flip sides. And of course, the likelihood of that is extremely small. But what we've also said is there's risk on both sides. The 20th Amendment self-consciously presupposed electoral discretion in the context of the death of a candidate prior to the vote in the Electoral College. And if that happens, but laws like Washington and Colorado ban the exercise of discretion, then the votes from those electors could, in principle, be wasted. And that could throw the decision into the House, and that could flip the result, also unexpected, also potentially creating chaos. So there's chaos both ways. And the number of times we've had candidates die is actually twice as frequently as we've had electors switch their vote and vote for somebody from the other side. I'm sorry to interrupt. I want to get another question. You set this up as, in essence, the states versus the electors in some sense. But isn't it also appropriate to think of this as the voters versus the electors, and that your position would, in essence, potentially disenfranchise voters in the state? Your Honor, of course, in our case, the action of the electors was to further enfranchise the voters in the state. As a general theory, I'm sorry to interrupt, wouldn't your position potentially lead to that? It's potentially true. That's right, Your Honor. Okay. And then the last question is, the question here is not whether the Constitution requires the states to bind electors. Of course, it's whether the Constitution permits states to bind electors. And on that question, why doesn't the Tenth Amendment come in? Well, Your Honor, first, of course, the state doesn't invoke the Tenth Amendment. But if it did, it would fail. Because whereas in the Thornton case, for example, Justice Thomas could point to traditions that allowed the state to exercise the power that they wanted to exercise there. There is no tradition in America, maybe in the Soviet Union, as Justice Kagan suggests, but not in America, of a government exercising control over a voter, over an elector. That power doesn't exist. Therefore, it's not a question of whether it was taken away by the federal government. It wasn't given, it wasn't there before. And therefore, there is no Tenth Amendment power either. Counsel, thank you. You can take a minute to wrap up if you'd like. Thank you, Your Honor. The question here has got to both be the constitutional and the pragmatic. And the constitutional question is simply the question whether there is a power in the states which comes from the power to appoint, and there isn't. And it is also the question whether the electors, as electors, the same sort of electors that Article I creates, have a discretion. And the discretion is the same discretion which Congress people have when they exercise their judgment not to be punished at all under the principles of the Speech and Debate Clause. But there's also a question we acknowledge of the risks. But facing risks on both sides, this Court should do what it can do, which is to interpret the Constitution as the Constitution was written, and it has not been amended.